```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
MARIA VILLAR,                       :
                                    :
     Plaintiff,                     :
                                    :        09-cv-7400 (JSR)
     -v-                            :
                                    :        OPINION & ORDER
CITY OF NEW YORK, et al.,           :
                                    :
     Defendants.                    :
                                    :
------------------------------------x
```

JED S. RAKOFF, U.S.D.J.

Plaintiff Maria Villar was a lieutenant in the New York Police Department (the "NYPD" or the "Department") until the NYPD terminated her employment. On August 21, 2009, she sued the City of New York and certain NYPD officers, alleging discrimination, retaliation, and a hostile work environment in violation of federal, state, and city civil rights laws. Following the untimely death of my esteemed colleague Deborah Batts, the case was reassigned to the undersigned on February 5, 2020.

The NYPD asserts that it fired Villar because she improperly disclosed sensitive Department information. Villar's brother Sergio De Los Santos was arrested for narcotics trafficking. Villar called a friend in the Department, inquired about Sergio's case, and learned that Sergio's case was part of a larger investigation involving wiretaps and search warrants. She conveyed this information to her other brother, Alberto. As it happened, Alberto was Sergio's coconspirator, and the NYPD had

1

tapped Alberto's phone. They overheard Villar disclosing the existence of the investigation to Alberto. The NYPD instituted disciplinary proceedings against Villar, ultimately finding that she had wrongfully disclosed NYPD information; as the penalty for this violation, the Department terminated her employment.

At this advanced stage of the case, Villar's claims have been substantially narrowed, but three categories of claims remain. First, Villar alleges that the penalty imposed by the NYPD for wrongful disclosure of information was motivated by race and sex; for example, Villar maintains that a similarly situated white man was given a substantially lower sanction after a comparable finding of wrongdoing. Second, Villar alleges that the decision to terminate her was actually made in retaliation for protected conduct -- namely, retaliation for her filing internal NYPD complaints concerning alleged civil rights violations. Finally, Villar alleges certain discrimination by her former supervisor Michael Yanosik. Specifically, Villar alleges that Yanosik treated Villar substantially worse than similarly situated white men in that, among other things, he refused to afford her supervisory powers despite her rank as lieutenant, granted her significantly less overtime than similarly situated white men, and required her to perform demeaning tasks.

Villar's other claims were previously dismissed. Among other things, this means that the Court may no longer consider Villar's

2

arguments that she did not, in fact, wrongfully disclose NYPD information. See, e.g., Memorandum & Order, ECF No. 77, at 6 ("[N]ot only is the question of Plaintiff's guilt irrelevant to the discrimination inquiry, but the Court has already disposed of Plaintiff's discrimination claims based on the NYPD's prosecution of charges against her and ultimate finding of guilt. The . . . remaining issue is whether the penalty resulting from this prosecution--Plaintiff's termination--was motivated by her sex.") (citations omitted).

Two motions are now before the Court. First, the defendants move to enforce a settlement agreement which, according to the defendants, the parties' attorneys executed on March 22, 2021. Second, the law firm previously representing Villar, Cronin & Byczek LLP (the "Firm"), moves for charging and retaining liens to secure its alleged right to attorney's fees. Villar filed a written response to each motion, and on May 26, 2021, the Court held an evidentiary hearing. For the reasons that follow, both motions are granted and the defendants are ordered to consummate the settlement by paying $410,500 to Villar and $189,500 to the Firm. Upon consummation of the settlement, this case will be closed.

## BACKGROUND

The parties' familiarity with the underlying facts and allegations is assumed.

3

As noted, Villar filed this suit on August 21, 2009. The defendants all filed Answers by January 7, 2010. Discovery closed on September 10, 2012. The defendants moved for summary judgment, and the motion was fully briefed as of November 2012. On September 29, 2015, Judge Batts issued an opinion granting in part and denying in part the motion for summary judgment. As a result, only the following claims remained:

Plaintiff's Title VII, [New York State Human Rights Law] and [New York City Civil Human Rights Law ("NYCHRL")] sex-based disparate treatment and retaliation claims regarding her termination; Plaintiff's hostile work environment claim pursuant to the NYCHRL; and Plaintiff's individual capacity claims against Yanosik as to the denial of overtime on the basis of race under § 1981 and § 1983 and as to the creation of a hostile work environment under the NYCHRL.

Opinion Granting in Part and Denying in Part Defendants' Motion for Summary Judgment, ECF No. 54, at 81.

The parties filed voir dire questions, requests to charge, and a joint final trial report in June 2016; the defendants filed motions in limine in June 2016. In September 2017, Judge Batts ruled on the motions in limine.

As noted, the case was reassigned to the undersigned on February 5, 2020. The Court promptly held a status conference and then set the case for trial on a mutually agreeable date in August 2020. Due to the COVID-19 pandemic, however, the Court had to adjourn the trial. The Court was able to secure a trial date on October 13, 2020, but plaintiff's counsel informed the Court that

she had developed COVID-19 symptoms. The Court adjourned the trial date again, this time to April 7, 2021.

On March 22, 2021, Linda Cronin, Esq., Villar's attorney, emailed Chambers, copying opposing counsel, and informed the Court that the parties had settled the matter in principle. Accordingly, the Court entered an order dismissing the complaint, without prejudice to any party moving to reopen within 30 days if settlement was not fully effectuated.

Thereafter, on April 5, 2021, Villar and Cronin wrote to the Court, each requesting that Cronin be relieved as counsel for Villar. Villar told the Court that she had not consented to settle the case. Cronin denied this, but she agreed that in light of Villar's accusations, irreconcilable differences would preclude her from continuing the representation. Following a teleconference, the Court vacated its order terminating the case, reopened the case, granted the motion to relieve the Firm as counsel for plaintiff, authorized the Firm to move for retaining and charging liens, and set a new date on which Villar would try the case pro se: July 12, 2021.

The defendants moved to enforce the settlement agreement, and the Firm moved for retaining and charging liens. The Court will address each of these motions in turn.

MOTION TO ENFORCE THE SETTLEMENT AGREEMENT

## I.   Legal Standard

Defendants' motion to enforce the settlement agreement turns on a question of agency: is Villar bound by Cronin's acceptance, on her behalf, of the City's offer to settle this case?

That question is governed by federal law because when Villar filed this case, she invoked the federal-question jurisdiction of this Court. Wang v. IBM, 634 F. App'x 326, 326 (2d Cir. 2016) (summary order) ("When, as here, a case aris[es] under federal law, the scope of an agent's authority is determined according to federal precedent.") (quotation marks and citation omitted).

Under federal common law, "a settlement agreement is binding only if the attorney (the agent) had the client's (the principal's) actual or apparent authority to enter into the agreement." Hillair Capital Invs., LP v. Smith Sys. Transp., Inc., 640 F. App'x 49, 51 (2d Cir. 2016) (summary order). Federal courts "presume that an attorney-of-record who enters into a settlement agreement, purportedly on behalf of a client, had authority to do so." Pereira v. Sonia Holdings (In re Artha Mgt.), 91 F.3d 326, 329 (2d Cir. 1996). "In accordance with that presumption, any party challenging an attorney's authority to settle the case under such circumstances bears the burden of proving by affirmative evidence that the attorney lacked authority." Id.

6

Actual authority stems from "direct manifestations from the principal to the agent." Reiss v. Societe Centrale Du Groupe Des Assurs. Nationales, 235 F.3d 738, 748 (2d Cir. 2000). The Court may infer actual authority "from words or conduct which the principal has reason to know indicates to the agent that [s]he is to do the act." United States v. Intl. Blvd. of Teamsters, 986 F.2d 15, 20 (2d Cir. 1993). Apparent authority stems from manifestations by the principal to third parties or to the world at large. Hillair, 640 F. App'x at 52 ("Essential to the creation of apparent authority are words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction.").

Of course, an attorney does not always have actual authority to settle a client's claims. Cf. Artha Mgmt., 91 F.3d at 329 ("It is axiomatic that the decision to settle a case rests with the client. Moreover, a client does not automatically bestow the authority to settle a case on retained counsel.") (citations omitted). However, absent contrary evidence, an attorney generally has apparent authority to settle. Hillair, 640 F. App'x at 52 (describing "the general presumption that an attorney-of-record has authority to settle" and finding apparent authority based in part on the attorney's appearance on behalf of the client, filing an answer, opposing summary judgment, and so forth, combined

with the fact that the client never objected to that representation). Silence can evince apparent authority, as well. Id. ("We may . . . find apparent authority where the principal remained silent when he had the opportunity of speaking and when he knew or ought to have known that his silence would be relied upon."); see also Int'l Bhd. of Teamsters, 986 F.2d at 21 ("It is a client's duty to express disapproval of a settlement within a reasonable time, if he has a basis for disapproval. If he does not object he makes the settlement his own.") (quoting approvingly Beirne v. Fitch Sanitarium, Inc., 167 F. Supp. 652, 654 (S.D.N.Y. 1958)).

For example, in International Brotherhood of Teamsters, the Second Circuit found apparent authority where the client "waited sixteen months after the date of the Settlement before attempting to deny [the] attorney['s] ... authority." 986 F.2d at 20; see also Hillair, 640 Fed. App'x at 52-53 (finding apparent authority where there was no objection to settlement until almost a year and a half later); Hallock v. State, 64 N.Y.2d 224, 232, 474 N.E.2d 1178 (1984) (same following "silence for more than two months"); but see Gomez v. City of New York, 805 F.3d 419, 422 (2d Cir. 2015) (per curiam) (holding, where client objected to the court that his attorney lacked authority to settle the case "just five days after" the filing of the stipulation of dismissal, that the district court

8

abused its discretion when, without an evidentiary hearing, it
found that the attorney had settlement authority).

II.  Findings of Fact and Conclusions of Law '

At the evidentiary hearing, Villar testified that she did not
authorize Cronin to settle the case.  Cronin testified that Villar
gave explicit oral authorization for a settlement of $500,000 or
more.   Given these inconsistent accounts, the Court must make
credibility determinations and findings of fact.

During the evidentiary hearing, the Court heard lengthy
testimony from, inter alia, Cronin, Villar, Cronin's daughter, and
Villar's sister.  Based on the totality of the evidence, written
and testimonial, as well as the witnesses' demeanors, the Court
finds that Cronin and her daughter were credible, while Villar's
testimony was materially inaccurate.  Although the Court credits
Villar's sister's testimony, she was not possessed of sufficient
information to materially inform the question at hand -- namely,
whether Cronin had settlement authority.

Based on the totality of the evidence admitted at the
evidentiary hearing, the Court finds the following facts.  It is
undisputed that Villar at all times sought some personal
vindication for what she regarded as an injustice done to her by
the City.  The Firm, and Cronin in particular, was highly cognizant
of that desire for vindication.   On some occasions, Villar

9

indicated that she would not settle the case for money, without some further vindication -- e.g., reinstatement.

However, after literally years of sporadic litigation and negotiations, two things happened that changed the situation radically. First, at summary judgment Judge Batts greatly reduced the scope of Villar's case in a way that would make it much more difficult for her to elicit testimony at trial to demonstrate all that she hoped to demonstrate. Villar has made it abundantly clear that she wants a day in court to prove that she was wrongfully terminated. Following Judge Batts's summary judgment ruling, however, Villar lost the ability to take any of those claims to trial. At trial, Villar would be precluded from arguing that she was wrongfully accused of disclosing Department information.

Second, the City had previously at least entertained the possibility of reinstating Villar as part of a settlement agreement, if she agreed to immediately retire. The City had even taken a preliminary look at the pension-related implications of such an approach. But during settlement negotiations in 2020-2021, the City unequivocally stated that it would not agree to reinstate Villar as a condition of settlement (even if she agreed to retire immediately thereafter).

Against that background and with trial fast approaching, in March 2021 Cronin again spoke with Villar and sought permission to negotiate a financial settlement. Cronin pointed out that such a

settlement could itself be seen as a form of vindication since, in Cronin's view, the City would not settle for $600,000 unless it felt there was some kind of problem. Cronin also offered to call a press conference and to pursue other avenues for uncovering the NYPD's allegedly wrongful conduct.

Cronin concedes that Villar wanted her day in court and sometimes indicated that she would not settle for anything short of reinstatement. However, based on all the evidence before the Court, the Court credits Cronin's testimony that in March 2021 Villar orally authorized Cronin to accept a settlement for at least $500,000. Cronin was able to negotiate a settlement for $600,000, in exchange for dismissal of all Villar's claims. Cronin then informed the City's attorney that her client accepted that offer.

Based on the evidence adduced at the hearing, Cronin promptly informed both the Court and her client of the settlement. And while Villar had further written communications with her attorney on several occasions during the days following the settlement, she waited almost two weeks before disavowing the settlement in writing. Villar met with Cronin in person several days after Cronin accepted the settlement, and Villar expressed reservations about immediately signing the settlement paperwork. However, the Court credits Cronin's and her daughter's testimony that, although Villar reiterated her desire to seek further vindication beyond money, Villar did not during those meetings indicate that Cronin

had lacked authority to settle the case. During the in-person meetings, Cronin once again reassured Villar that the settlement would have the effect of vindicating her, given how the settlement would be portrayed to the public and the press.

To be sure, Villar was quite upset by the settlement of the case, and in her April 5 letter and thereafter she has made it abundantly clear that she would prefer that the case go to trial. But the operative question is not Villar's present wish; it is whether Cronin had actual settlement authority when she accepted the City's offer on March 22. Because the Court credits Cronin's testimony that Villar gave her explicit settlement authority, Villar's subsequent change of heart is legally irrelevant.[1]

MOTION FOR RETAINING AND CHARGING LIENS

I. Legal Standard

Cronin & Byczek LLP moves for two liens, a charging lien and a retaining lien. Although a different legal standard governs

---

[1] As an independent basis for enforcing the settlement agreement, the Court also finds that Cronin had apparent authority to settle. The Firm represented Villar throughout this litigation, filing pleadings, exchanging discovery, taking depositions, and filing and opposing motions for more than a decade. Therefore, a presumption of apparent authority attaches and Villar bears the burden to prove by affirmative evidence that Cronin lacked apparent authority to settle the case. Villar points to no manifestations that she made to the City, its agents, or other relevant third parties that would tend to suggest that her counsel of record lacked authority to settle the case.

12

each, in this case the two liens require the Court to answer the same question: was the Firm properly terminated for cause?

## A. Legal Standard: Charging Lien

A charging lien is an equitable interest in a client's cause of action. The attorney's right to a charging lien originated in the common law and dates back at least to the eighteenth century. Itar-Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 442, 449 (2d Cir. 1998) ("Lord Kenyon observed that it had been 'settled long ago, that a party should not run away with the fruits of the cause without satisfying the legal demands of his attorney, by whose industry, and in many instances at whose expense, those fruits are obtained.'") (quoting Read v. Dupper, 101 Eng. Rep. 595, 596 (1795)). The charging lien was transplanted across the Atlantic and formed part of the common law of New York. See Adams v. Stevens & Cagger, 26 Wend. 451, 455 (1841) ("[B]y the law of this state, as it has always existed from the time of its first settlement, the lawyer, as well as the physician, was entitled to recover a compensation for his services; and that such services were never considered here as gratuitous or honorary merely."); Rooney v. Second Ave. R. Co., 18 N.Y. 368, 369 (1858) ("As in other cases of lien, the attorney is protected, because it is by his labor and skill that the judgment has been recovered. The judgment being under the control of the court, and the parties within its

13

jurisdiction, it will see that no injustice is done to its own officers.").

In 1876, the right to a charging lien was codified. The present statutory language, now found at New York Judiciary Law § 475, dates to 1899. The statute provides:

From the commencement of an action, . . . the attorney who appears for a party has a lien upon his or her client's cause of action, claim or counterclaim, which attaches to a verdict, report, determination, decision, award, settlement, judgment or final order in his or her client's favor, and the proceeds thereof in whatever hands they may come; and the lien cannot be affected by any settlement between the parties before or after judgment, final order or determination. The court upon the petition of the client or attorney may determine and enforce the lien.

This statute "creates an equitable right and remedy cognizable in the federal courts." Itar-Tass, 140 F.3d at 448 (quoting Markakis v. S.S. Mparmpa Christos, 267 F.2d 926, 927 (2d Cir. 1959)). "The statute is remedial in character, and hence should be construed liberally in aid of the object sought by the legislature, which was to furnish security to attorneys by giving them a lien upon the subject of the action." Fischer-Hansen v. Brooklyn Heights R. Co., 173 N.Y. 492, 495, 66 N.E. 395 (1903).

Attorneys at the Firm served as attorneys of record for the plaintiff throughout the pendency of the case (until recently relieved by the Court). Therefore, the Court may award a charging lien to the Firm unless the Firm "was discharged for cause." Mason v. City of New York, 67 A.D.3d 475, 475, 889 N.Y.S.2d 24, 25

14

(2009). Under New York law, "[a] client has an absolute right to discharge an attorney at any time." Teichner ex rel. Teichner v. W & J Holsteins, Inc., 64 N.Y.2d 977, 979, 478 N.E.2d 177, 178 (1985). "An attorney who is discharged for cause, however, is not entitled to compensation or a lien." Doviak v. Finkelstein & Partners, LLP, 90 A.D.3d 696, 699, 934 N.Y.S.2d 467, 470 (2d Dep't 2011).

Thus, with regard to the motion for a charging lien, the principal question presented is whether there was "evidence of misconduct on the part of former counsel," Pomerantz v. Schandler, 704 F.2d 681, 683 (2d Cir. 1983) (per curiam), such that the discharge was "with cause," Teichner, 64 N.Y.2d at 979.

B. *Legal Standard: Retaining Lien*

A retaining lien is a "security interest," arising under state common law, in "all client papers and property, including money, that come into the attorney's possession in the course of employment." See Resol. Tr. Corp. v. Elman, 949 F.2d 624, 626 (2d Cir. 1991). The lien permits an attorney to keep all such client property "as security against payment of fees . . . unless the attorney is discharged for good cause." Id. (citing People v. Keeffe, 50 N.Y.2d 149, 155-56, 428 N.Y.S.2d 446, 449, 405 N.E.2d 1012, 1015 (1980)); accord Pomerantz, 704 F.2d at 683 (citing In re San Juan Gold Inc., 96 F.2d 60 (2d Cir.1938)).

15

If an attorney is discharged without cause, then she may assert a retaining lien on the client's papers and property in her possession "until the amount of [her] fee is fixed by agreement or by litigation and is paid." People v. Keeffe, 50 N.Y.2d 149, 155, 405 N.E.2d 1012 (1980). This is true even if the failure to turn over the files would harm the client's, or others', interests. For example, in In re San Juan Gold, 96 F.2d 60, 60-61 (2d Cir. 1938), the former client had entered bankruptcy. The former attorney sought a retaining lien and refused to turn over files that, all agreed, could be useful in the reorganization proceeding. The Second Circuit held that the former attorney need not turn over the files until his fees were paid in full or until adequate security was posted. The Second Circuit explained,

> The record contains no evidence that the debtor is without funds, but however this may be, the fact is immaterial. Nor is it material that the debtor's reorganization proceedings may be thwarted, if access to the papers is denied. The attorney's lien cannot be disregarded merely because the pressure it is supposed to exert becomes effective. If it is worth anyone's while to have the [reorganization] proceedings continue and the papers are essential to that end, the necessary funds to obtain their release may be forthcoming; if not, the debtor and its trustee must do without them.

Id.

As previously noted, if an attorney is discharged "with cause, the attorney has no right to compensation or to a retaining lien." Teichner, 64 N.Y.2d at 979. Thus, the request for a retaining lien presents the same principal question as the request for a

16

charging lien: did Villar discharge the Firm for cause? The Court turns now to that question. "In general, a hearing is required to determine whether a client has cause for discharging an attorney." Doviak v. Finkelstein & Partners, LLP, 90 A.D.3d 696, 699, 934 N.Y.S.2d 467, 470–71 (2d Dep't 2011). In resolving this dispute, the Court held an evidentiary hearing. Its findings of fact and conclusions of law are based upon all documents and testimony received in evidence at the hearing, as well as the Court's credibility determinations based upon, among other things, the witnesses' demeanors.

## II. Findings of Fact and Conclusions of Law

It is clear from the evidence now before the Court that Villar exercised her prerogative to terminate the Firm on April 5, 2021 at 9:50 p.m., when she accused Cronin of settling the case without authorization and wrote, "I will go to court on Wednesday as scheduled without an attorney. . . . I do not want any more involvement with you. . . ." ECF No. 100-3 at 12.

From Villar's briefing and argument, which the Court construes liberally considering her pro se status, the Court discerns five potential arguments for why the Firm might have been terminated for cause.

First, Villar objects to some of the Firm's legal strategies, particularly related to discovery (e.g., not re-calling officers who had already been deposed, not submitting an accountant's report

17

or deposing an accountant relating to certain financial records).
For example, Villar complains that when she showed Cronin some
forensic accounting evidence she wished to have introduced, Cronin
said, "Maria that is impossible to do with so much papers. If we
show the financial report to the jury they will get confused, I
myself don't know where to start." ECF No. 90, at 7 (quotation
marks omitted).

This objection is inadequate as a matter of law to support
termination for cause. See Doviak v. Finkelstein & Partners, LLP,
90 A.D.3d 696, 699, 934 N.Y.S.2d 467, 470-71 (2d Dep't 2011) ("[A]
client's dissatisfaction with reasonable strategic choices
regarding litigation does not as a matter of law, constitute cause
for the discharge of an attorney.") (quotation marks and citations
omitted). The Firm's litigation choices on all of the disputed
topics were, at least reasonable. For example, it was not
unreasonable for Cronin to believe that the forensic accountant's
report would have caused confusion for the jury (even assuming
arguendo that it was marginally relevant to those claims that have
not been dismissed).

Second, Villar accuses Cronin and the Firm of incompetence
and inattentiveness, including offloading work onto Villar. Id.
at 4 ("She . . . asked me to prepare a sequence of events and send
it to her together with more documents related to the case. She
had absolutely no idea of what had transpired, but certainly knew

18

that it was easy to get everything she needed from me."). Villar notes that Cronin mostly communicated by text messages and emails and rarely spoke to her on the phone.

In this respect, Villar suggests that Cronin was not ready for trial because she had not reviewed the documents. Villar argues that if Cronin had truly spent as much time as she claims in her time entries, she would have been an expert in the case. Id. at 6 ("I myself did not spent half the time she is claiming, and I was the one who did all the work including the questions to be asked by her and her attorneys to the different witnesses during their depositions, not her. Enclosed are two (2) sets of those question I prepared.") (citation omitted); id. at 5 ("I was the one who went through all those boxes of papers submitted in this case. I was the one who provided her everything she needed to submit the papers to the Court.").

Villar has not demonstrated incompetence or inattentiveness that would justify termination for cause. To be sure, "[a]n attorney who violates a disciplinary rule may be discharged for cause and is not entitled to any fees for services rendered." Id. Therefore, manifest incompetence in violation of the Rules would support discharge for cause. But here, the Firm ultimately successfully navigated more than a decade of litigation, securing a substantial favorable settlement. Even if the Court were to find that Villar's complaints show that the Firm was not the model

19

of a polished litigation boutique, Villar has not come close to demonstrating a failure of performance that would justify terminating the Firm for cause and stripping it of its right to a lien after more than a decade of work.

Third, Villar points out that Cronin was suspended from the New York Bar during the pendency of this case. Villar says Cronin never informed her of this and that, had she known of Cronin's suspension, she would have had the chance to hire a different attorney to clear her name.

As background, the Court summarizes the Appellate Division, Second Department's recitation of the facts supporting its suspension of Cronin in 2015. In re Linda Marie Cronin, No. 2012-06884 (2d Dep't July 22, 2015). The Firm had represented one Jose Romero in a wrongful death action concerning his wife. The Firm received settlement proceeds on behalf of Romero and deducted its fees, holding the remainder in a client account on behalf of Romero. However, Romero was serving a manslaughter sentence, and, because of the "Son of Sam law," the victims of his crime might have been entitled to recover against the settlement proceeds. The Firm was informed by the Crime Victim Board ("CVB") that the Board was seeking a TRO to freeze the funds. The Firm first told the Board that it was not planning to move the funds, but then it changed its mind and informed the Board that it would release the funds forthwith.

20

That same day, seven attorneys and a paralegal at the Firm had a five-hour meeting where they evidently came up with a strategy to protect the money. The next day, two attorneys of the Firm met with their client Romero; he entered into a new retainer agreement with the Firm, putatively to file suit to protect the corpus of his settlement, and Romero paid over to the Firm a $75,000 refundable deposit for that work.

The following day, the Firm transferred not $75,000 but the entire balance of the settlement (about $166,000) to the Firm's operating account, with the memo "retainer fee for Jose Romero." Hours later, the Firm was served with a TRO freezing the funds and an order to show cause why a preliminary injunction should not issue. Several weeks later, an attorney at the firm submitted an affirmation opposing the order to show cause, asserting that prior to receiving the TRO, the Firm had disbursed all settlement proceeds to Romero. This was untrue. In reliance on that affidavit, the state court vacated the TRO as moot.

The Firm filed a constitutional challenge to the Son of Sam law on behalf of Romero but effectively abandoned it, and the suit was eventually dismissed. Romero only ever received $100 of the settlement proceeds. The crime victims, through the Board, sued Romero and secured a default judgment. The crime victims sought to hold the Firm in contempt for violating the TRO. The Firm settled for $125,000.

21

Cronin was charged with "conduct involving dishonesty, fraud, deceit, or misrepresentation," "conduct which is prejudicial to the administration of justice," "charg[ing] an excessive fee," and "conduct that adversely reflects on her fitness as a lawyer." Id. The Second Department, per curiam, found that "[a]s an experienced trial attorney and the partner in charge of the litigation practice for the Firm, the respondent was actively involved in directing the decisions made by the Firm in the communications with the CVB, the handling of the settlement proceeds, and in the Firm's affirmation" in opposition to the Order to Show Cause. Id. The Firm's actions "evidence a concerted effort to circumvent the CVB TRO." Id. The Court concluded that Cronin

> has engaged in serious misconduct in her representation of Romero, involving, inter alia, dishonesty, fraud, deceit, and misrepresentation, which conduct is prejudicial to the administration of justice and adversely reflects on her fitness as a lawyer. Under the totality of the circumstances, we find that the respondent's conduct warrants her suspension from the practice of law for a period of one year.

Id. That period began on August 21, 2015.

Cronin was reinstated as an attorney in the State of New York on December 14, 2016. On August 28, 2017, Judge Batts issued an Order noting that she had been informed that Cronin had been suspended. She struck her appearance from the docket, ordering that Villar would continue to be represented by other attorneys who had appeared on her behalf (who were also from the Firm). On

22

November 20, 2017, the SDNY Grievance Committee restored Cronin to the rolls of practicing attorneys before this Court. On December 28, 2017, Cronin filed a renewed notice of appearance in this action.

Villar argues that Cronin never informed her of any of this and that she only learned about it recently. As a matter of law, Villar is correct that Cronin was required to notify her. 22 NYCRR § 691.10(d)(1) ("A disbarred, suspended or resigned attorney shall promptly notify, by registered or certified mail, return receipt requested, each of his clients who is involved in litigated matters or administrative proceedings, and the attorney or attorneys for each adverse party in such matter or proceeding, of his disbarment, suspension or resignation and consequent inability to act as an attorney after the effective date of his disbarment, suspension or resignation. The notice to be given to the client shall advise of the prompt substitution of another attorney or attorneys in his place."). And although the Court is aware of no New York case addressing whether failure to comply with this regulation would justify "cause" for termination, the Court finds that a New York court likely would so find.

Nevertheless, the Firm has carried its burden on this point. At the evidentiary hearing, the Court received in evidence the original return receipt for Cronin's letter to Villar, sent by certified mail, informing Villar of the suspension. The return

23

receipt was signed by Villar's brother. The Court finds that, by sending that letter, Cronin complied with her responsibility to notify Villar.

Fourth, Villar argues that the retainer agreement that Cronin claims that Villar signed is a forgery. Villar says that "[t]he signature of my name on that document is not my signature. I do not have to be an expert to draw to this conclusion because I know how I sing [sic] my name." ECF No. 90, at 1. Villar claims, "I am 100% sure that the document she provided to the Court is not real. The firm of CRONIN & BYZCEK, LLP, never gave me a contract to sign, except the letter given to me on April 5, 2021 [relating to settlement]." Id.

Obviously, if the Firm forged Villar's signature on a putative retainer agreement, that would justify termination for cause. However, based upon the evidence received during the hearing, documentary and testimonial, the Court credits Cronin's testimony and rejects Villar's testimony on this topic. The Firm attached the retainer agreement to its motion for liens, before Villar accused the Firm of forging her signature. The retainer agreement is entirely consistent with all the testimony regarding the expected rate of pay: Villar would reimburse the Firm's costs and pay a $7500 retainer; after exhaustion of the retainer, the case would convert to a one-third contingency. Villar later made a separate payment of $3000 for services related to an administrative

24

proceeding. The handwritten notations on the retainer correspond to the checks later received in evidence, and, although no supposed handwriting expert testified, but see Almeciga v. Ctr. for Investigative Reporting, Inc. et al, 185 F. Supp. 3d 401 (S.D.N.Y. 2016), the signature on the retainer is markedly similar to Villar's.

Given Cronin's unethical handling of Romero's case and, in particular, the false affidavit a junior attorney submitted to the court in that case, the Court has scrutinized Villar's accusations carefully. But in the end, they do not add up. If Villar were correct that the Firm forged her signature, that would mean not only that a law firm had litigated her case for more than a decade with no signed retainer but that the Firm's concoction of a fraudulent retainer was complete with accurate handwritten notations. Based on the Court's assessment of the witnesses' credibility, the Court finds it far more likely that the retainer is valid and that Villar forgot about a document that she signed more than a dozen years prior.

Fifth, Villar argues that the Firm was terminated for cause because Cronin settled this case without Villar's consent. If true, this would support termination for cause. Indeed, the Second Department has specifically found that if an attorney demands that a client accept a settlement, the client may terminate the attorney for cause. Squeri v. Fournarakis, 170 A.D.2d 444, 445, 565

N.Y.S.2d 232 (2d Dep't 1991) ("The record supports the hearing court's determination that the appellant was not entitled to any compensation for his legal services because his discharge by the plaintiff was for cause. Specifically, the appellant testified that he refused to personally try the plaintiff's lawsuit because she refused his advice to accept a settlement offered by the defendant physician. However, the exercise of a client's unfettered right to refuse a settlement secured by her attorney . . . does not warrant the latter's withdrawal from the case.") (quotation marks, brackets, and citations omitted).

Here, however, for the reasons stated above, the Court finds that Villar orally authorized Cronin in March 2021 to accept a settlement of $500,000 or more.

Because Villar has offered no valid basis for terminating the Firm for cause, the Court concludes that it was terminated without cause. The Court will impose a charging lien upon the proceeds of this case.

The Firm requests that it be paid on a contingency basis based upon the settlement ($200,000 less the $7500 + $3000 already paid by Villar). However, the Firm adds that if the case has not been settled that it should be paid on a quantum meruit basis, and the Firm requests $270,000 based on its attorneys' time entries and hourly rates.

26

Under New York law, "[i]f the [attorney's] discharge is without cause before the completion of services, then the amount of the attorney's compensation must be determined on a quantum meruit basis." Teichner, 64 N.Y.2d at 979 (1985) (emphasis added); accord Mason v. City of New York, 67 A.D.3d 475, 475, 889 N.Y.S.2d 24, 25 (2009). If the attorney had already completed services, however, then the attorney's compensation is determined according to the attorney-client contract.

Here, the Court has found that the Firm secured a settlement, with Villar's explicit advanced oral authorization. The case was properly closed and the Firm's services to Villar were substantially completed. Therefore, the Court finds that the Firm can recover directly under the retainer agreement, and there is no need to consider the quasi-contractual remedy of quantum meruit. The Firm will recover $189,500 ($200,000 minus the $7500 and $300 payments Villar has already made). The Court imposes a charging lien in that amount upon the proceeds of this case.

Under the circumstances of this case, the Court in its discretion declines to impose a retaining lien. Such a lien is unnecessary because the charging lien will fully vindicate the Firm's interests. A retaining lien would permit the Firm to keep Villar's property until the Firm's fee is paid, but such leverage is inappropriate in a contingency fee case like this. A retaining lien is appropriate where the client already owes a fee that the

27

client is failing to pay; the retaining lien can coerce such payment. But where, as here, the client owes no present fees and the only future fees the client will owe are contingency fees, the Firm may receive its fee directly from the defendants, in satisfaction of the charging lien; a retaining lien adds nothing.

For the foregoing reasons, the Court orders:

1. The defendants' motion to enforce the settlement agreement is granted. The jury trial presently scheduled for July 12, 2021 is cancelled.

2. The Firm's motion for liens is granted in part, and the Court imposes a charging lien in the amount of $189,500.

3. Within 60 days, the defendants are ordered to consummate the settlement by paying $410,500 to Villar and $189,500 to the Firm. Once the defendants have done so, they should file on the docket a notice so stating. At that time, the Court will dismiss Villar's remaining claims with prejudice and close this case.

SO ORDERED.

Dated:    New York, NY
          July 1, 2021

          JED S. RAKOFF, U.S.D.J.